IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

MiiCs & PARTNERS, INC., et al.,

    Plaintiffs,

v.

FUNAI ELECTRIC CO., LTD., et al.,

    Defendants.

SAMSUNG DISPLAY CO., LTD.,

    Intervenor.

Civil Action No. 14-804-RGA

MEMORANDUM ORDER

Presently before the Court are Defendants' Joint Motion to Exclude the Testimony of Damages Expert Scott D. Hampton (D.I. 379) and Plaintiffs' Motion to Exclude the Expert Report and Testimony of Ryan Sullivan (D.I. 383). I have considered the parties' briefing. (D.I. 380; 431; 461; 384; 432; 455; 533; 534; 537). I held oral argument on Defendants' motion in the related civil case, No. 14-803, on October 18, 2017. (Civ. Act. No. 14-803, D.I. 573). I held oral argument on Plaintiffs' motion on November 16, 2017. (D.I. 535).

### I. BACKGROUND

Plaintiffs MiiCs & Partners, America, Inc. and Gold Charm Ltd. filed this patent infringement action against Defendants Funai Electric, Ltd., P&F USA, Inc., and Funai Corp., Inc. on June 24, 2014. (D.I. 1). With the Court's permission, Plaintiffs filed an amended complaint on March 31, 2015, in which they asserted additional patents. (D.I. 38). On August 11, 2015, this Court stayed the case pending *inter partes* review before the PTAB. (D.I. 84).

After Plaintiffs agreed to withdraw certain patents on which the PTAB instituted IPRs, the Court lifted the stay on March 31, 2016. (D.I. 117). On June 15, 2016, the Court granted Samsung Display Co.'s motion to intervene. (D.I. 160).

The remaining patents-at-issue are U.S. Patent Nos. 6,211,534 ("the '534 patent") and 6,734,927 ("the '927 patent"). (*See* D.I. 548; 550). In light of my Memorandum Order of December 1, 2017 (D.I. 550), Samsung is no longer in the case.

## II.   LEGAL STANDARD

Federal Rule of Evidence 702 sets out the requirements for expert witness testimony and states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Third Circuit has explained:

> Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit. Qualification refers to the requirement that the witness possess specialized expertise. We have interpreted this requirement liberally, holding that "a broad range of knowledge, skills, and training qualify an expert." Secondly, the testimony must be reliable; it "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his o[r] her belief. In sum, *Daubert* holds that an inquiry into the reliability of scientific evidence under Rule 702 requires a determination as to its scientific validity." Finally, Rule 702 requires that the expert testimony must fit the issues in the case. In other words, the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact. The Supreme Court explained in *Daubert* that "Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility."

2

> By means of a so-called "*Daubert* hearing," the district court acts as a gatekeeper, preventing opinion testimony that does not meet the requirements of qualification, reliability and fit from reaching the jury. *See Daubert* ("Faced with a proffer of expert scientific testimony, then, the trial judge must determine at the outset, pursuant to Rule 104(a) [of the Federal Rules of Evidence] whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue.").

*Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404-05 (3d Cir. 2003) (footnote and internal citations omitted).[1]

## III. DISCUSSION

### A. Scott Hampton

Defendants move to exclude the testimony of Mr. Hampton on the grounds that his royalty rate does not fit the facts of this case, is not based on a reliable methodology, and over-estimates the value of the asserted patents. (*See generally* D.I. 380; D.I. 533 (setting forth Defendants' objections to Mr. Hampton's November 13th updated expert report)). More specifically, Defendants object to Mr. Hampton's (1) starting point assumptions, (2) *Georgia-Pacific* analysis, (3) use of a composite royalty rate, and (4) use of one hypothetical negotiation date.

#### 1. Starting Point Assumptions

First, Defendants object to several of Mr. Hampton's starting point assumptions to his reasonable royalty calculation. (D.I. 380 at 13; D.I. 533 at 2). Specifically, Defendants assert that Mr. Hampton has no support for his starting point assumption that the '534 patent would provide a 5% to 10% cost-savings benefit. (D.I. 380 at 13; D.I. 533 at 4–5). According to

---

[1] The Court of Appeals wrote under an earlier version of Rule 702, but the recent amendments to it were not intended to make any substantive change.

Defendants, Mr. Hampton claims to have based the 5% to 10% benefit on a conversation he had with Plaintiffs' technical expert, Dr. Watts. (D.I. 380 at 14; D.I. 533 at 5). Plaintiffs contend that during his deposition, however, Dr. Watts testified that he was not asked to quantify the yield and cost-savings of the '534 patent. (D.I. 380 at 14; D.I. 533 at 5). When asked whether the yield improvement of the '534 patent "would be something like five to 10 percent," however, Dr. Watts responded "that would be the kind of number [he] would come up with." (D.I. 533 at 5 (quoting D.I. 381, Exh. 8)). Thus, Plaintiffs argue, Mr. Hampton's cost-savings starting point is unsupported and should be excluded. (*Id.*; D.I. 380 at 15). I disagree. Whether Dr. Watts told Mr. Hampton that the '534 patent confers a 5% to 10% cost-savings benefit, upon which Mr. Hampton relied in forming his damages opinion, is a factual issue better suited for cross-examination.

Next, Defendants fault Mr. Hampton for basing Defendants' purported profits on smallest salable patent-practicing units that overestimate the values of the '534 and '927 patents. (D.I. 380 at 15; D.I. 533 at 4).[2] More specifically, Defendants argue that Mr. Hampton bases his royalty rate for the '534 patent on Defendants' profits from the entire thin-film transistor ("TFT") array, even though the inventors "did not invent the TFT array; they invented, at best, incremental improvements to the TFT array." (D.I. 380 at 16; *see also* D.I. 533 at 4). They argue Mr. Hampton similarly overestimates the value of the '927 patent by attributing Defendants' profits to the entire frame component. (D.I. 380 at 16).

In light of my ruling above with respect to Mr. Hampton's use of a 5% to 10% cost-savings benefit for the '534 patent, Mr. Hampton's apportioning between the patented and

---

[2] Defendants make a similar argument with respect to the '176 patent. (D.I. 380 at 9–10; D.I. 533 at 3). That patent is no longer in the case.

4

unpatented features of the TFT array is no longer at issue. In other words, his use of a 5% to 10% cost-savings benefit demonstrates that he properly apportioned damages and profits between the patented and unpatented features of the array. I agree with Defendants, however, that Mr. Hampton did not apportion between the patented and unpatented features of the invention claimed in the '927 patent. Thus, his reasonable royalty calculation as to that patent is unreliable under *Daubert* and will be excluded.

As the Federal Circuit has explained, "Where small elements of multi-component products are accused of infringement, calculating a royalty on the entire product carries a considerable risk that the patentee will be improperly compensated for non-infringing components of that product." *Laser Dynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). The general rule, therefore, is for "royalties [to] be based not on the entire product, but instead on the 'smallest salable patent-practicing unit.'" *Id.* (citation omitted).

Under the entire market value rule, however, which is an exception to this general rule, the patentee may rely on the entire market value of the accused product if the patentee demonstrates that "the patented feature creates the 'basis for the customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (alteration in original) (citations omitted). If the patentee cannot satisfy the entire market value rule, then the patentee "must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative." *Id.* (internal quotation marks and citation omitted). The Federal Circuit has explained further that where the entire market value rule does not apply, "courts must insist on a more realistic starting point for the royalty calculations by juries—often,

5

the smallest salable unit and, at times, even less." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) (citation omitted).

In this case, there is no dispute that the smallest salable unit Mr. Hampton used for the '927 patent, that is, the LCD module frame, contains both patented and unpatented features. Plaintiffs do not contend that the entire market value rule should apply. Thus, in order to satisfy the apportionment requirement under Federal Circuit law, Mr. Hampton was required to apportion profits and damages between the patented and unpatented features of the module frame. *See Uniloc*, 632 F.3d at 1318; *see also Ericsson*, 773 F.3d at 1227; *AVM Techs., LLC v. Intel Corp.*, 2013 WL 126233, at *2 (D. Del. Jan. 4, 2013) ("[T]he 'entire market value rule' can apply to a smallest saleable patent practicing unit when the smallest saleable patent practicing unit is itself made up of multiple components.").

In my opinion, Mr. Hampton's expert report provides no basis for concluding that he apportioned between the patented and unpatented features of the frame. The only place where Mr. Hampton appears to consider the profit attributable to the invention, as distinguished from unpatented features, is in his discussion of *Georgia-Pacific* Factor 13. (*See* D.I. 381, Exh. 1 ¶ 227). That discussion, however, lacks any meaningful analysis or attempt to quantify the portion of realizable profit that should be attributed to the patented feature of the smallest salable unit. He states, "I have identified elements produced by Funai which contribute to the profitability of the accused product not attributable to the Patents-In-Suit. These include Funai's brand and trademarks, marketing, facilities, an assembled and trained workforce, vendor relations and contracts, and customer relations and contracts." (*Id.* ¶ 228). Mr. Hampton goes on to conclude, "*Georgia-Pacific* Factor 13 would have had a downward impact on the royalty rate considered in the hypothetical negotiation." (*Id.* ¶ 239). While "mathematical precision is not required,"

6

*WhitServe, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012), Mr. Hampton fails to give any "reliable and tangible" evidence "tending to separate or apportion [Defendants'] profits and the patentee's damages between the patented feature and the unpatented feature" of the LCD module frame, *Uniloc*, 632 F.3d at 1318. His damages opinion as to the '927 patent is therefore unreliable under *Daubert*.

Defendants additionally object to Mr. Hampton's damages calculation for the '927 patent on the basis that he uses a single, unaccepted offer for a license, made by Mr. Boles on behalf of MiiCs, as a starting point assumption for the '927 patent. (D.I. 533 at 2). They argue the offer is an improper starting point because it "was to license an entire portfolio of over 360 patents . . . which is not comparable to any license that NEC and Funai would have agreed to in a hypothetical negotiation for the '927 patent." (*Id.*). Further, Defendants assert that because the starting point is merely an offer, which was rejected by Funai, it "says nothing about what a willing licensee would pay even if the entire portfolio of patents were comparable." (*Id.* at 3). Thus, Mr. Hampton's "'starting point' assumption of an '$0.80' royalty for the '927 patent amounts to nothing more than a guess and warrants exclusion." (*Id.*).

I agree with Defendants that Mr. Boles' unaccepted offer is an improper starting point for the '927 patent. The Federal Circuit has acknowledged that "proposed licenses may have some value for determining a reasonable royalty in certain situations." *Whitserve*, 694 F.3d at 29–30. "Their evidentiary value is limited, however, by, *inter alia*, the fact that patentees could artificially inflate the royalty rate by making outrageous offers." *Id.* at 30 (citation omitted).

Here, Mr. Boles' unaccepted offer has limited, if any, value for determining a reasonable royalty for the '927 patent. First, Mr. Boles' offer has less value by virtue of its being an offer, rather than a license agreement. *See id.* at 29–30. Second, the timing of Mr. Boles' offer

7

suggests it was made in anticipation of litigation. He offered to license the portfolio to Funai in April 2014, shortly before Plaintiffs filed this action against Defendants—Plaintiffs filed suit in June 2014. (D.I. 1). As Mr. Hampton stated in his updated report, "If Funai refused the offer, MiiCs would enforce its patent claims through litigation, which occurred." (D.I. 522 ¶ 15). Litigation-influenced offers, like settlement agreements, *see LaserDynamics*, 694 F.3d at 77–78, are less likely to reflect the value of the claimed invention. Third, the hypothetical licensor in February 2012, when the hypothetical negotiation would have taken place, is NEC Corporation, not MiiCs. Thus, Mr. Boles' offer on behalf of MiiCs is even less reliable as a starting point assumption since NEC was not a party to that negotiation.[3]

Defendants next argue that Mr. Hampton erroneously relies on NEC's lost profits without showing that NEC would be entitled to any lost profits. (D.I. 380 at 16). More specifically, Defendants contend that Mr. Hampton did nothing to establish "but for" causation by either proving each of the *Panduit* factors or by showing that the relevant market is made up of only two suppliers. (*Id.* at 17).

I do not agree with Defendants that Mr. Hampton needed to establish "but for" causation with respect to NEC's lost profits. There is no dispute that Mr. Hampton does not offer an opinion on lost profits damages. Rather, he conducted a reasonable royalty analysis. "That a patent owner prove that it would have made the infringer's sales 'but for' the infringement," however, is not required in a reasonable royalty damages analysis. *Asetek Danmark A/S v. CMI*

---

[3] Plaintiffs note that in his *Georgia-Pacific* analysis, Mr. Hampton also considered a license agreement MiiCs executed with Mitsubishi (D.I. 537 at 3), which Mr. Hampton asserts is similar to the proposal Mr. Boles presented to Funai (D.I. 522 ¶¶ 20, 22). Plaintiffs filed suit against Mitsubishi on the same day they filed this action against Defendants. (Civ. Act. No. 14-805, D.I. 1). In any event, according to his updated report, Mr. Hampton did not use the Mitsubishi license agreement as a starting point for the '927 patent. To the contrary, it appears Mr. Hampton's sole starting point for that patent is Mr. Boles' offer to Funai. (D.I. 522 ¶¶ 15, 16).

8

*USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017) (citations omitted). Further, as the Federal Circuit has recognized, "a patent owner participating in a hypothetical negotiation would consider the profits on sales it might lose as a result of granting a license." *Id.* (citation omitted). It was therefore not improper for Mr. Hampton to consider NEC's lost profits without proving "but for" causation.

### 2. *Georgia-Pacific* Analysis

Second, Defendants fault Mr. Hampton for failing to use a reliable methodology to tie his starting point assumptions to his final royalty rate. (D.I. 380 at 18; D.I. 533 at 6). Specifically, Defendants argue that in his *Georgia-Pacific* analysis, Mr. Hampton "did not do any mathematical calculation," but merely "recreated what he *thinks* the parties would have done in the hypothetical negotiation." (D.I. 380 at 18). Further, citing *WhitServe*, Defendants argue Mr. Hampton's analysis is "insufficient to inform the jury what a reasonable royalty would be," because "[h]e never explains [] how much of an impact each factor has on the final royalty rate." (D.I. 533 at 6).

Defendants' objection to Mr. Hampton's analysis on the basis that he "did not do any mathematical calculation" lacks merit. In *WhitServe*, the Federal Circuit recognized that "mathematical precision is not required." 694 F.3d at 31; *see also i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 857–58 (Fed. Cir. 2010) ("[A]ny reasonable royalty analysis necessarily involves an element of approximation, and uncertainty.") (citation omitted). Further, in my opinion, Defendants' objection to Mr. Hampton's analysis on the basis that he did not sufficiently explain to what extent each factor impacts the final royalty rate is not the proper subject of a *Daubert* motion. Mr. Hampton's methodology is not what is being challenged. The core of Defendants' argument is that Mr. Hampton has not provided enough detail. It may be

9

that Mr. Hampton's analysis is insufficient at trial. *See WhitServe*, 694 F.3d at 31–32 (noting that when expert witnesses testify about damages in patent cases "some explanation of both why and generally to what extent [a] particular factor impacts the royalty calculation is needed"). On the other hand, there may be some elaboration, which would result in the testimony being adjudged sufficient. At this point, however, I will not exclude Mr. Hampton's testimony on the basis that his report fails to provide enough explanation. I think the issue raised is not so much a *Daubert* issue as it is a disclosure issue.

### 3. Composite Royalty Rate

Third, Defendants argue, "Mr. Hampton's damages opinion should also be excluded because his royalty base vastly over counts the number of infringing units." (D.I. 380 at 19–20). Specifically, Defendants assert that Mr. Hampton's damages calculation "enormously overstates the footprint of each claimed invention in the marketplace, as it forces the Defendants to pay a royalty for patents that the Defendants' products are not even accused of infringing." (*Id.* at 20). Defendants explain that to reach his damages calculation, Mr. Hampton applies a royalty base that includes units accused under any asserted patent to a royalty rate with contributions from every asserted patent. (*Id.*).

As I explained on November 16th (D.I. 535 at 112:4–12), I do not believe that use of a composite rate is consistent with Federal Circuit case law. The Federal Circuit has made clear, "At all times, the damages inquiry must concentrate on compensation for the economic harm caused by infringement of the claimed invention." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010) (citation omitted); *see also* 35 U.S.C. § 284 ("Upon finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by

10

the infringer . . . ."). The court, therefore, "must carefully tie proof of damages to the claimed invention's footprint in the market place." *ResQNet.com*, 594 F.3d at 869 (citations omitted).

Mr. Hampton's royalty rate assigns to each accused product the same per-unit royalty regardless of how many patents that product is accused of infringing. Thus, his analysis results in a damages calculation that overcompensates Plaintiffs and does not appropriately reflect the inventions' footprints in the marketplace. *See ResQNet.com*, 594 F.3d at 869. I therefore agree with Defendants that the damages calculation Mr. Hampton performed using a composite royalty rate should be excluded.[4]

### 4. Hypothetical Negotiation Date

Finally, Defendants argue that Mr. Hampton erroneously uses only one hypothetical negotiation date in his damages analysis. (*Id.* at 21). As I indicated on November 16th (D.I. 535 at 111:11–17), I think there will be competing expert testimony on whether one or multiple negotiation dates reflects a real-world negotiation under the facts of this case. Defendants' objection goes to the weight of Mr. Hampton's damages testimony, not to its admissibility.

---

[4] In his updated report, Mr. Hampton provides an alternative damages analysis in which he calculates a separate royalty rate for each individual patent. (*See* D.I. 522). Defendants object to this alternative analysis. (D.I. 533 at 2). They argue Mr. Hampton offers no explanation as to why he abandoned his original analysis. (*Id.*). Further, they assert it is unfair and prejudicial to Defendants for Plaintiffs to be introducing a new damages theory at this point in the case. (*Id.*). I will not exclude Mr. Hampton's new analysis on the basis that Plaintiffs disclosed it too close to trial. As I understand it, Plaintiffs asked Mr. Hampton to perform an alternative analysis following the oral argument on October 18th, during which I stated that I generally do not think the composite rate is consistent with Federal Circuit law. (Civ. Act. No. 14-803, D.I. 573 at 211:2–3). I am not convinced Defendants are prejudiced by Plaintiffs' disclosure of the new theory at this point in the case. Defendants will have the opportunity to cross-examine Mr. Hampton about his new analysis at trial.

## B. Ryan Sullivan

Plaintiffs argue that Dr. Sullivan's proffered testimony should be excluded for four principle reasons. (*See generally* D.I. 384).

First, they argue Dr. Sullivan improperly ignores the negotiating position of the hypothetical licensor. (*Id.* at 12). The core of Plaintiffs' argument is that Dr. Sullivan uses an overly "formulaic approach," which violates the rationale for the Federal Circuit's rejection of the 25% rule. (*Id.* at 14). As Defendants have explained, however, Dr. Sullivan did consider the circumstances of the hypothetical licensor, and, in so doing, he concluded that "NEC's bargaining position would not have contributed any additional value to the reasonable royalty." (D.I. 432 at 13; D.I. 535 at 58:21–25). In any event, I do not think Plaintiffs have shown that Dr. Sullivan's methodology with respect to the position of the hypothetical licensor is arbitrary or unreliable so as to warrant exclusion under *Daubert*.

Second, Plaintiffs fault Dr. Sullivan for not using the analytical approach. (D.I. 384 at 15). Here, Plaintiffs' objections focus on Dr. Sullivan's use of a company-wide profit margin to calculate profits from the patented technology. (*Id.* at 16). They point specifically to Dr. Sullivan's calculations with respect to the '589 and '190 patents (*id.*), which are no longer at issue in this case (D.I. 548). Third, according to Plaintiffs, Dr. Sullivan erroneously assumes that the reasonable royalty cannot exceed Defendants' profits. (D.I. 384 at 17). They point to Dr. Sullivan's deposition testimony in which he stated, "Funai would not be willing to undertake a project that does not cover their cost of capital." (*Id.* (quoting Exh. B, 114:9–10)). In my opinion, Plaintiffs' second and third objections go to the weight of Dr. Sullivan's testimony, not to its admissibility. Plaintiffs have not shown that Dr. Sullivan's use of a company-wide profit

12

margin or his opinion that the royalty rate would be limited by Funai's willingness to license the patents are excludable under *Daubert*.

Finally, Plaintiffs assert that Dr. Sullivan's use of multiple hypothetical negotiation dates is not tied to the facts of this case. (*Id.* at 18). As I explained above with respect to Mr. Hampton's use of one hypothetical negotiation date, I think this objection goes to the weight of Dr. Sullivan's damages testimony, not to its admissibility.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion (D.I. 379) is **GRANTED-IN-PART** and **DENIED-IN-PART** and Plaintiffs' motion (D.I. 383) is **DENIED**. Mr. Hampton's damages opinion is **EXCLUDED** as to the '927 patent.

It is **SO ORDERED** this 7 day of December, 2017.

*[Signature]*
United States District Judge